[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12424

Non-Argument Calendar

_____

T.R., a Minor,
by and through her Mother, Porsha Brock,

Plaintiff-Appellant,

*versus*

LAMAR COUNTY BOARD OF EDUCATION, THE,

VANCE HARRON,
in his individual and official capacity,

LISA STAMPS,
in her individual and official capacity,

KATHY DEAN,
in her individual and official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 6:19-cv-01101-LSC

_____

Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

WILSON, Circuit Judge:

Plaintiff-Appellant T.R., a minor, by and through her mother, Porsha Brock, appeals the district court's grant of Defendant-Appellee's motion for summary judgment. T.R. brought a Fourth Amendment unreasonable search claim under 42 U.S.C. § 1983 against her school's Principal Lisa Stamps, Counselor Kathy Dean, and Superintendent Vance Harron. The district court granted summary judgment in favor of the Defendants, finding that the school officials were entitled to qualified immunity. T.R. also appeals the district court's grant of summary judgment in favor of the Defendants on her state-law invasion of privacy claim against Principal Stamps and Counselor Dean as well as her state-law claim of outrage against Principal Stamps, Counselor Dean, Superintendent Harron, and the Lamar County Board of Education. Because we find that the district court erred in granting qualified immunity, we reverse the district court's grant of summary

judgment regarding T.R.'s Fourth Amendment claim.  We also reverse the district court's grant of summary judgment in favor of the Defendants regarding T.R.'s invasion of privacy and outrage claims.

I.

The facts, viewed in the light most favorable to T.R., are as follows.  A teacher at T.R.'s school, Sulligent High School in Lamar County, Alabama, smelled marijuana burning in the classroom and alerted school administrators, Principal Stamps and Assistant Principal Matthew Byars, who searched the belongings of every student in the class.  The school officials did not find any marijuana, but found marijuana stems and seeds, rolling paper, two lighters, and an assortment of pills in T.R.'s backpack.  School officials then escorted T.R. to Counselor Dean's office where they began an investigation.  During the course of the investigation, two students from T.R.'s class told Principal Stamps that they saw T.R. light a marijuana cigarette in class.  T.R. admitted to school officials to having a drug problem and regularly smoking marijuana, but she denied smoking marijuana in the classroom that day and she denied having additional drugs on her person.

Unable to find any evidence of marijuana in T.R.'s belongings, Principal Stamps and Counselor Dean decided to strip search T.R.  The district court noted that the parties heavily dispute the facts surrounding the school official's strip search of T.R.  According to T.R., school officials strip searched her twice.  The first time, T.R. contends, occurred in a room with only Principal Stamps and

Counselor Dean where the school officials asked T.R. to remove her clothing, lift her breasts, and bend over for an inspection. It is undisputed that school officials did not find any drugs on T.R.'s person following the first search. Following the first search, T.R. remained in Counselor Dean's office and her mother and sister arrived at the office. T.R. alleges that school officials again directed T.R. to remove her clothing, to which T.R. submitted. T.R. also alleged that a window in the door of the counselor's office leading to a public hallway remained uncovered during the first strip search, but there was no evidence suggesting that a student or other school official observed the strip searches through the window. T.R. stated that she was on her menstrual cycle when she was searched, which made her feel "humiliated and embarrassed and gross." T.R.'s teacher found the remains of the marijuana cigarette under T.R.'s desk the next day.

The district court found that Principal Stamps, Counselor Dean, and Superintendent Harron were entitled to qualified immunity regarding T.R.'s Fourth Amendment claim because, *inter alia*, T.R. did not identify any materially similar precedent that would have put the Defendants on notice of a constitutional violation.

Since the district court found that the Defendants did not violate a clearly established law, it did not reach the issue of whether T.R.'s allegations amounted to a Fourth Amendment violation. The district court also found that the Defendants were immune from T.R.'s invasion of privacy claim. Lastly, T.R.'s claim for

outrage failed because the Defendants' conduct was not extreme and outrageous.

## II.

We review a district court's grant of summary judgment de novo. *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009). We view the evidence and factual inferences in a light most favorable to the nonmoving party when evaluating the claims at summary judgment. *Id.*

"Qualified immunity protects municipal officers from liability in § 1983 actions as long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* An officer must first show that he acted within his discretionary authority to receive qualified immunity. *Id.* Then, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Id.* Applying a two-step framework, the court first looks to whether the officer's conduct amounted to a constitutional violation. *Id.* Second, the court analyzes whether the right was "clearly established" at the time of the violation. *Id.* However, it is not required that the court analyze the constitutional right first under step one and can instead proceed directly to "analyzing whether the right was clearly established under step two." *Id.* "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3)

conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *D.H. by Dawson v. Clayton Cty. Sch. Dist.*, 830 F.3d 1306, 1318 (11th Cir. 2016).

At issue here is "[t]he Fourth Amendment 'right of the people to be secure in their persons . . . against unreasonable searches and seizures.'" *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009). That right "generally requires a law enforcement officer to have probable cause for conducting a search." *Id.* at 370. However, the search and seizure of a child by school officials presents a unique question which "requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985). Therefore, the legality of a search in this context does not depend on the ordinary "probable cause" standard; it depends "simply on the reasonableness, under all the circumstances, of the search." *Id.* at 340–41.

This analysis requires "a twofold inquiry." *Id.* "[F]irst, one must consider whether the action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances." *Id.* (cleaned up). A search by a school official of a student is "justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *Id.* at 342 (internal quotation marks omitted). "Such a search will be permissible in its scope when the measures adopted are reasonably related to the

objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.*

*Safford* involved school officials' search of a thirteen-year-old girl suspected of carrying prescription-strength ibuprofen pills. *Safford*, 557 U.S. at 368. The school officials obtained a report that the student was giving the pills to other students. *Id.* School officials then searched the student's backpack, but did not find any pills. *Id.* Next, school officials instructed the student to strip down to her undergarments. *Id.* at 369. Finally, school officials told the student to "pull her bra out and to the side and shake it, and to pull out the elastic on her underpants, thus exposing her breasts and pelvic area to some degree," but still no pills were found. *Id.* While the Supreme Court found that the search of the student's backpack and outer clothing was reasonable, it found that that the "strip search" of the student was unreasonable. *Id.* at 374–77. The Court recognized that the strip search was a separate search and reasoned that "both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Id.* at 374. Emphasizing that strip searches can be "embarrassing, frightening, and humiliating," the Court noted the indignity of strip searches implicated "the rule of reasonableness as stated in *T.L.O.*, that the search as actually conducted be reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 374–75 (internal quotation

marks omitted and alterations adopted).  The Court also reasoned that "the categorically extreme intrusiveness of a search down to the body of an adolescent requires some justification in suspected facts." *Id.* at 376.  Since "what was missing from the suspected facts that pointed to [the student] was any indication of danger to the student from the power of the drugs or their quantity, and any reason to suppose that [the student] was carrying pills in her underwear," the Court found that the strip search was unreasonable. *Id.* at 376–77.

We recently addressed the issue of strip searches of students in *D.H.*, 830 F.3d 1306 (11th Cir. 2016).  Similar to the facts here, school officials strip searched a student on suspicion that the student had marijuana. *Id.* at 1315–16.  Applying the two-step analysis from *T.L.O.*, we found at the first step that the strip search was reasonable at its inception. *Id.* at 1315–17.  Since this was a strip search case, we applied the rule in *Safford* and found that the school officials held "a reasonable suspicion" of searching D.H.'s underwear because of evidence that at least one other student had hidden marijuana in his underwear and a statement from another student that D.H. possessed marijuana. *Id.* at 1316–17.  However, we found that the search failed the scope prong of the *T.L.O.* test because the search was not "*reasonably related to the objectives of the search*" and was "*excessively intrusive* in light of the age and sex of the student and the nature of the infraction." *Id.* at 1317 (emphasis in original).  The search was excessive in scope because the school official asked D.H. to fully remove all of his clothes "in

front of D.H's peers" which "bore no rational relationship to the purpose of the search itself." *Id.* We reasoned that a "strip search in the presence of one's peers would exponentially intensify the embarrassment, fright, and humiliation a student experiences when undergoing a strip search." *Id.* (internal quotation marks omitted and alterations adopted). Instead, school officials could have pursued a less intrusive means such as "asking D.H. to pull his waistband away from his body" and the decision to strip search D.H. in front of his peers made the search unreasonable. *Id.* at 1318. Accordingly, we concluded that the school official's actions violated clearly established law, citing to *Safford*. *Id.* at 1318–19.

### III.

Our discussion proceeds in three parts. First we address T.R.'s § 1983 Fourth Amendment claim. Second, we address her invasion of privacy claim. Third, we address her claim of outrage.

As an initial matter, to be entitled to qualified immunity, the school officials had to demonstrate that they were acting within their discretionary authority. *Lewis*, 561 F.3d at 1291. In their brief in support of their motion for summary judgment, the Defendants argued that Principal Stamps and Counselor Dean were within their discretionary authority because supervising students was within their official duties. On appeal, T.R. argues that Principal Stamps and Counselor Dean were not within their discretionary authority because they strip searched T.R. without first obtaining specific approval of Superintendent Harron, which violated schoolboard policy. However, she did not raise this argument

before the district court in her brief in opposition to the Defendant's motion for summary judgment regarding her Fourth Amendment claim.[1]  Since she did not raise this argument before the district court, she waived this argument below.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("[A]n issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.").

Turning to T.R.'s main argument that qualified immunity should not have been granted, we conclude that the district court erred in finding that T.R.'s right was not clearly established at the time of the challenged conduct.  At the time Principal Stamps and Counselor Dean strip searched T.R., there had been two materially similar cases involving strip searches by school officials, *Safford* and *D.H.*  Both cases resulted in a finding that the strip searches were unreasonable under *T.L.O.*

Starting with *Safford,* the Supreme Court held that "[b]ecause there were no reasons to suspect the drugs presented a danger or were concealed in [the student's] underwear, we hold that the search did violate the Constitution . . . ."  557 U.S. at 368.  Here, the district court reasoned that because school officials could not find marijuana in T.R.'s backpack, then they had reason to

---

[1] T.R. did raise the argument that the school officials acted beyond their authority regarding her state-law claims.  However, she did not expressly challenge the school officials' discretionary authority regarding her Fourth Amendment claim.

suspect that they would find marijuana in T.R.'s underwear or bra. Thus, according to the district court, the school officials had sufficient reason to suspect T.R. contained drugs under her clothing, which made this case factually distinguishable from *Safford*. However, this type of reasoning is of the sort that the Supreme Court expressly forbade in *Safford*. There, the court rejected the school's argument that "as a truth universally acknowledged . . . students . . . hide contraband in or under their clothing[.]" *Id.* at 376 (internal quotation marks omitted and alterations adopted). The Court classified this reasoning as a "general background possibilit[y]" that a student could be hiding contraband under their clothing. *Id.* This type of general possibility is insufficient when considering "the categorically extreme intrusiveness of a search down to the body of an adolescent." *Id.*

Instead, the school official must possess "some justification in suspected facts . . . that [the strip search] will pay off." *Id.* The Court provided three scenarios where a school official might have "suspected facts" sufficient to justify a strip search: (1) where there is evidence of a general practice of students at the school hiding contraband in their underwear, (2) when other students suggest to a school official that a particular student is hiding contraband in their underwear, or (3) when an earlier search of another student's underwear yielded contraband. *Id.* None of these circumstances were present in this case. While other students indicated that they had seen T.R. smoking a marijuana cigarette, the students did not indicate that she hid them in her underwear. Further, there is no

evidence that any other students at the school had previously hidden contraband under their clothing. As a result, the school officials should have been on notice that they lacked the necessary "justification in suspected facts" required by *Safford*.

Further, to grant qualified immunity on these facts would severely diminish the protections afforded students from strip searches set out in *Safford*. The Supreme Court, recognizing that a strip search was "categorically distinct" from a search of outer clothing and belongings based on "subjective and reasonable societal expectations of personal privacy," "place[d] a search that intrusive in a category of its own demanding its own specific suspicions." *Id.* at 374, 377. The district court's reasoning would remove the requirement of "specific suspicions" and replace it with a rule that anytime a school official does not find drugs in a student's backpack, then they are justified in strip searching the student.

Accordingly, we conclude that the district court erred in distinguishing this case from *Safford* by reasoning that there was a specific suspicion that T.R. was hiding drugs under her clothing because no drugs were found in her belongings. This is not a specific suspicion, but rather a "general background possibilit[y]," which is insufficient to justify a strip search of a student by a school official under *Safford*. *Id.* at 376.

The district court further erred in reasoning that case was distinguishable from *Safford* because the drugs in the case presented more of a danger than the ones in *Safford*. This reasoning goes to the first prong of the holding in *Safford* that there must be

"reasons to suspect the drugs presented a danger" to justify a strip search. *Id.* at 368. In *Safford*, the drugs at issue were "prescription-strength ibuprofen and over-the-counter naproxen, common pain relievers equivalent to two Advil, or one Aleve." *Id.* at 375–76. The Court in *Safford* does not suggest that the danger is linked solely to the type of drug, but rather emphasized that "[the school official] had no reason to suspect that large amounts of drugs were being passed around, or that individual students were receiving great numbers of pills." *Safford*, 557 U.S. at 376. Thus, the danger the Court seemed more concerned with was the threat that drugs were being passed around to other students. However, in this case, the evidence shows that this danger was not present. As noted in the district court's opinion, school officials "found drugs[2] and drug paraphernalia in only one place: a backpack belonging to a fourteen-year-old female student named TR." Thus, there was no threat that the other students in T.R.'s class were using drugs or that T.R. was passing drugs around in class. Accordingly, the fact that different drugs were involved in *Safford* than in this case is not a material difference.

In addition to erring in finding that there was no clearly established law that rendered this search unjustified at its inception under the first prong of *T.L.O.*, the district court further erred in finding that there was no clearly established law that rendered this

---

[2] "[D]rugs," as it is used here in the district court's opinion, must refer to the prescription pills found in T.R.'s backpack. School officials did not find any marijuana in T.R.'s backpack.

search unreasonable in its scope under the second prong. The case on point for the reasonableness in scope of a strip search of a student is our decision in *D.H.* Although, there, we concluded that the strip search was justified at its inception under prong one because there was evidence that students were hiding drugs under their clothes, it was not reasonable in scope under prong two because the school official required the student to strip in front of his peers. *D.H.*, 830 F.3d at 1318. While the district court recognized that *D.H.* was the most analogous precedent for T.R., it found that it did not clearly establish that the school officials' actions in this case were unconstitutional. This conclusion was based on an improperly narrow reading of *D.H.* The district court read our decision in *D.H.* to only establish that a strip search is unconstitutional when done in the presence of the student's peers. However, we noted in *D.H.* that the "measures adopted" in a strip search must be "*reasonably related to the objectives of the search* and *not excessively intrusive.*" *Id.* at 1317 (emphasis in original). In *D.H.*, we found that the decision by the school official to have the student remove all of his clothing "bore no rational relationship to the purpose of the search itself." *Id.* Thus, D.H. clearly establishes that the actions taken by a school official in a strip search must be rationally related to the purpose of the search, which in this case would be finding marijuana.

Here, there are two facts that establish this search was not reasonable in scope. First and foremost, school officials strip searched T.R. twice. Not only did they not have reasonable

suspicion to strip search T.R. the first time, but the school officials also clearly had no basis to strip search T.R. a second time after the first search yielded nothing.  T.R. did not leave the counselor's office in between the searches, so there is no basis to conclude that she might have acquired marijuana in that time.  Thus, asking T.R. to strip naked a second time "bore no rational relationship to the purpose of the search itself." *Id.* at 1317.

Second, T.R. alleged that the first search was conducted in front of an open window in the counselor's office.  The open window was in the office's door, which led to a public hallway.  Although the Defendants dispute this fact in their brief, we view the facts in the light most favorable to the plaintiff at the summary judgment stage.  Even though, luckily, no students or other school officials saw T.R. while she was being strip searched, that is ultimately beside the point.  The presence of a window made it possible that someone could see T.R. in this vulnerable position.  This possibility would have made the actual search much more frightening, as T.R. had no way of knowing if someone would walk by.  Thus, conducting the search in front of an open window to a public hallway "unnecessarily subjected [T.R.] to a significantly higher level of intrusion."

Accordingly, we conclude that the district court erred in finding that *D.H.* was distinguishable enough from this case that the Defendants were not on notice of a constitutional violation. *D.H.* clearly established that when a school official makes the strip search    more    intrusive    than    necessary,    the    search    is

unconstitutional.  Although there were no students present in the room during the strip search, as was the case in *D.H.*, we do not think that is a material difference that would shield the Defendant's actions in this case.  As the Supreme Court noted in *Mullenix v. Luna*, for a clearly established right in the context of qualified immunity, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." 577 U.S. 7, 12 (2015).  We think that our precedent in *D.H.* puts the constitutional question in this case "beyond debate" where school officials, conducting a strip search, unnecessarily subject the student "to a significantly higher level of intrusion," the search is unreasonable in its scope.  *D.H.*, 830 F.3d at 1317.  Therefore, the district court erred in finding that *D.H.* was not analogous precedent in this case that provided a clearly established example of a constitutional violation in the context of a strip search of a student.

In sum, we conclude that both *Safford* and *D.H.* provide "case law with indistinguishable facts clearly establishing the constitutional right," *id.* at 1318, and the district court erred in finding to the contrary in this case.

Although we find that there was a genuine issue of material fact as to whether the Defendants' conduct was unreasonable under clearly established law, our analysis does not end there.  In addition to finding that the right was clearly established, we must also "determine[] whether the [Defendants'] conduct amounted to a constitutional violation." *Lewis*, 561 F.3d at 1291.  The district

court did not address this issue, but instead granted summary judgment in favor of the Defendants because the law was not clearly established. We conclude that a factfinder could find the Defendants' conduct constituted a constitutional violation, as demonstrated in our "clearly established" analysis above. As discussed, the school officials' strip search was unreasonable at its inception under the first prong of *T.L.O.* because the school officials did not have "reasons to suspect the drugs presented a danger or were concealed in [T.R.'s] underwear." *Safford*, 557 U.S. at 368. The strip search was also unreasonable in its scope under the second prong of *T.L.O.* because the school officials' decision to strip search T.R. twice and in front of an open window "exposed [T.R.] to an unnecessary level of intrusion that rendered the search excessive in scope, and, therefore, unconstitutional." *D.H.*, 830 F.3d at 1318.

Since the Defendants' actions violated a clearly established constitutional right, we conclude that the Defendants are not entitled to qualified immunity. Thus, the district court erred in granting summary judgment in favor of the Defendants on T.R.'s Fourth Amendment claim. Accordingly, we reverse and remand to the district court on T.R.'s 42 U.S.C. § 1983 unreasonable search and seizure claim.

## IV.

Turning next to T.R.'s invasion of privacy claim, T.R. argues that because the Defendants violated a schoolboard policy when it strip searched T.R., the Defendants are not entitled to State-agent

immunity, thus shielding them from liability for T.R.'s invasion of privacy claim.

Alabama's "State-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). "When a defendant raises the defense of State-agent immunity, the defendant bears the initial burden of showing that he or she qualifies for State-agent immunity." *Ex parte Brown*, 182 So. 3d 495, 503 (Ala. 2015). "If the defendant satisfies that burden, the burden then shifts to the plaintiff to show that one of the two exceptions to State-agent immunity is applicable." *Id.* Under Alabama law, the defendant is not entitled to State-agent immunity if the plaintiff shows that the defendant "acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Grider v. City of Auburn*, 618 F.3d 1240, 1255 (11th Cir. 2010).

In *Brown*, the Alabama Supreme Court noted that in analyzing whether a State agent acted "beyond his or her authority," "the determinative consideration is whether the State agent failed to discharge duties pursuant to *detailed* rules and regulations." *Brown*, 182 So. 3d at 504 (internal quotation marks omitted and emphasis added). There, the issue was whether a police officer acted "beyond his or her authority" by failing to adhere to a city's pursuit policy. *Id.* The Alabama Supreme Court concluded that "[b]ecause the policy provides that the procedure for all pursuits is subject to an officer's or the officer's supervisor's exercise of discretion . . . the policy and procedure constitute guidelines, not

'detailed rules and regulations, such as those stated on a checklist' that *must* be followed by an officer" *Id.* at 506 (emphasis in original).

Here, the district court applied the Alabama Supreme Court's reasoning in *Brown* and concluded that the schoolboard policy was too broad and left too much to discretion. Thus, the policy was more akin to guidelines than detailed rules and regulations. In relevant part, the policy provides:

> Student searches must be conducted by a school administrator in the presence of another certified school employee and may include a private pat down of the student, a search of personal items and clothing, or a more thorough search upon specific approval of the Superintendent. Personal searches will be conducted with due regard for the age and gender of the student. Searches that require physical contact between the school official and the student, removal of clothing, or examination of the student in a way that would implicate privacy concerns must be conducted and witnessed by officials of the same gender as the student and in a way that preserves the dignity of the student to extent practicable under the circumstances.

Despite the mandatory phrases that "[s]tudent searches *must* be conducted by a school administrator in the presence of another certified school employee" and "[s]earches that require physical contact . . . *must* be conducted and witnesses by officials of the

same gender," the district court found that "[t]his language leaves much to discretion. T.R. argues that her strip search was "a more thorough search" than a private pat down or search of personal belongings or clothing and since Principal Stamps and Counselor Dean did not obtain approval from Superintendent Harron before conducting this more thorough search, they were acting beyond their authority and not entitled to State-agent immunity.

The parties do not seem to dispute that Superintendent Harron was not notified before the strip search took place. However, the Defendants maintain that the schoolboard policy is a general guideline and not a detailed list of rules. Accordingly, failure to abide by these "guidelines" would not remove the Defendants' State-agent immunity. *Brown*, 182 So. 3d at 506. We are not convinced that the schoolboard policy is only a guideline and not a detailed list of rules. In *Giambrone*, the Alabama Supreme Court looked to whether a wrestling coach's failure to abide by coaching guidelines meant that the coach was acting beyond his authority and therefore not entitled to State-agent immunity. *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003). There, the court noted that the wrestling coach's "'broad authority' to exercise judgment in the safe conduct of his wrestling team practices was limited by the guidelines and rules furnished and imposed." *Id.* at 1054. A few examples provided were that coaches must not arrange matches between players who differed greatly in skill and prohibiting certain types of wrestling moves. *Id.* The court found that these "guidelines and rules provided specific instructions regarding

the proper techniques to be used in coaching the sport of wrestling." *Id.* at 1055. The court concluded that "[b]ecause a trier of fact could determine that [the coach] performed an illegal move during an 'inequitable' challenge match, thereby failing to discharge duties pursuant to 'detailed rules or regulations,' we cannot determine at [the summary judgment] stage in the proceedings that [the coach] is entitled to State-agent immunity." *Id.*

Here, the Defendants are certainly entitled to "broad authority" in determining who to search and the level of intrusiveness necessary for a search. However, as in *Giambrone*, the Defendants' authority to search students is "limited by the guidelines and rules furnished and imposed." *Id.* at 1054. For example, the schoolboard policy requires that more thorough searches require "specific approval of the Superintendent." Further, searches requiring physical contact must be conducted by school officials of the same gender as the student being searched. We cannot agree with the district court that the schoolboard policy "leaves much to discretion" in terms of how certain searches must be conducted. Like the wrestling coach in *Giambrone*, we cannot say that a school official would be discharging his or her duties pursuant to "detailed rules or regulation" if the school official did not conduct a search in accordance with this policy. Thus, the schoolboard policy is not a guideline, which, if not followed, would have no impact on a school official's entitlement to State-agent immunity. Rather, the policy is a detailed set of rules and regulations. Because a trier of fact could determine that the Principal Stamps and Counselor

Dean conducted a more thorough search without seeking approval from the Superintendent, we cannot conclude that Defendants are entitled to State-agent immunity. Accordingly, we reverse the district court's grant of State-agent immunity to the Defendants as to T.R's invasion of privacy claim.

V.

Lastly, we address T.R.'s state-law claim of outrage. Under Alabama law, "the tort of outrage is the same cause of action as intentional infliction of emotional distress." *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 675 n.1 (Ala. 2017). "For a plaintiff to recover under the tort of outrage, she must demonstrate that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.* at 676. "The conduct complained of must be so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in civilized society." *Id.* at 676–77 (internal quotation marks omitted). The Alabama Supreme Court has only recognized the tort of outrage in three circumstances: (1) wrongful conduct in the family-burial context, (2) barbaric methods employed to coerce an insurance settlement, and (3) egregious sexual harassment. *Id.* at 677. However, the tort of outrage is not limited to those three situations. *Id.*

The district court found that T.R.'s outrage claim failed because the Defendant's conduct was not "outrageous or extreme enough to create a question of fact." T.R. contends that the district

court understated the severity of the strip search, emphasizing the intrusive nature of the strip search and the fact that the school officials strip searched T.R. twice. The Defendant's main response to T.R. is that the conduct was not outrageous or extreme when considering the fact that T.R.'s mother hugged the school officials after the search. Despite ignoring the fact that T.R.'s mother is now suing the school, this fact also does not take into consideration how T.R. was affected by this search. The district court noted in its opinion that T.R. believed the two searches were "especially intrusive" because, one, she was on her menstrual cycle, and two, the search was conducted in front of an open window. As a result, T.R. felt "humiliated and embarrassed and gross."

When considering the degree of intrusiveness of the search and the fact that school officials searched T.R. twice, we conclude that T.R.'s claim for outrage creates a sufficient question for the jury and the district court erred in ruling on this claim at the summary judgment stage. Although this case is not within the three scenarios where the Alabama Supreme Court has found outrage before, the tort of outrage is not limited to those three situations. *Wilson*, 266 So. 3d at 677. Accordingly, we reverse the district court's order granting summary judgment in favor of the Defendants as to T.R.'s outrage claim.

**REVERSED and REMANDED**.